CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
for Roanoke
MAR 18 2011
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TIMOTHY R. MUELLER, | ) | Civil Action No. 7:10-cv-00239 |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JOHN M. JABE, | ) | By: Hon. Jackson L. Kiser |
|    Defendant. | ) | Senior United States District Judge |

Timothy R. Mueller, a former[1] Virginia inmate proceeding pro se, filed a verified civil rights complaint, pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as the sole defendant John M. Jabe, Deputy Director of the Virginia Department of Corrections ("VDOC") in both his official and individual capacities. Plaintiff alleges that the defendant violated his constitutional and statutory rights to the free exercise of religion and equal protection and excessively entangled the state government with religion. The defendant filed a motion for summary judgment, and plaintiff responded, making the matter ripe for review. After reviewing the record, I grant the defendant's motion for summary judgment.

I.

Plaintiff has practiced the Roman Catholic faith since childhood and was incarcerated in the Dillwyn Correctional Center ("DCC"). Plaintiff states that his religious beliefs require him to observe the Catholic "Holy Days of Obligation": each Sunday of the year; The Solemnity of Mary the Mother of God (January 1); Ascension Thursday (Thursday of the sixth week of Easter); The Solemnity of the Assumption of the Blessed Virgin Mary (August 15); The Solemnity of the Feast of All of the Saints (November 1); The Solemnity of the Immaculate Conception of the Blessed Virgin Mary (December 1); and The Solemnity of the Nativity of Our Lord and Savior, Jesus Christ

---

[1]The VDOC released plaintiff from incarceration during the pendency of this litigation. Plaintiff filed new motions for leave to proceed in forma pauperis because he is unable to pay the outstanding balance of the filing fee. After reviewing the motions, I grant his requests.

(December 25). Plaintiff is bound by "universal and particular Church law to observe the Holy Days of Obligation of the Universal Christian Church (hereafter Catholic Church), and that such aforesaid laws are binding upon him[] under penalty of grave sin." (Pl.'s Aff. (no. 32) ¶ 2.) Plaintiff believes that the DCC's failure to recognize the Holy Days of Obligation "causes severe mental and emotional spiritual damages[,] . . . . includ[ing] a loss, potentially of the rewards of eternal life (Heaven)." (Id. ¶ 3.) Plaintiff stated to John Jabe via his September 2009 letter that to observe these days requires "mass or, forbidding that, communion or other community liturgical prayer." (Pl.'s Ex. 1 (no. 2-1) 1.) Plaintiff states in his verified complaint that to observe these Holy Days also requires abstention from work and participation in leisure activities. Plaintiff avers that he was employed at the DCC as an "academic aide" during the events described in his complaint and would have been subject to termination and disciplinary action if he observed the Holy Days by abstaining from work. (Pl.'s Aff. in Resp. (no. 42, Ex. D) ¶ 7.)

VDOC Operating Procedure ("DOP") 841.3 describes the VDOC's policy for inmates' religious programs. (Def.'s Br. Supp. Mot. Summ. J. (no. 37) Ex. I (Cei Aff.) Encl. A.) The policy provides that "Christian Holy Days/Seasons may be observed by Roman Catholic, Greek Orthodox, Protestant denominations, Jehovah Witness, Church of Jesus Christ of Latter Day Saints (Mormons), Messianic Jews, and Yahwists. Observances recognized by the [V]DOC are Easter and Christmas."[2] (Cei Aff. ¶ 4, DOP 841.3(IV)(B)(6).) Notably, the policy provides that the VDOC "shall give no preference to the activities of one religious denomination, faith, or sect over another." (DOP 841.3(I).) Religious services and group activities must be visually observed "in accordance with the requirements concerning the facility's orderly operations and safety of the offender

---

[2]The VDOC also acknowledges the Muslim observances of Ramadan/Month of Fasting, the Eid-ul-Fitr feast, and the Eid-ul-Adha feast and the Jewish observances of Passover, Sukkoth, Shavuot, and Chanukah. The policy advises staff to separate various Muslim factions during Muslim observances and Jewish factions during Jewish observances whenever possible within budgetary and staffing constraints. (DOP 841.3(IV)(B)(4)-(6).)

population." (Id. (IV)(A)(6)(d).)

DCC acknowledges various religions' holidays throughout the year, and the observances usually allow excused absences from work and programming assignments, a celebratory meal eaten in congregation, and corporate worship services for the practicing inmates. (Pl.'s Aff. (no. 32) ¶ 1.) For Catholic inmates, Catholic services are provided to offenders at DCC on a regular and on-going basis, and Catholic volunteers come to DCC on a regular basis to conduct various religious activities. (Warden Aff. ¶ 7.) Mass with sacramental wine and bible study are available for the Catholic population. (Id.)

The policy recognizes "that although each offender has the right to worship in their chosen manner, levels of offender participation and availability of facility resources and religious leaders do not permit separate services for every possible form of worship at every facility." (DOP 841.3 (IV)(B)(1).) Although recognized religious groups may not hold formal meetings without staff authorization, approval, and supervision, inmates may hold "informal religious gatherings or discussions in leisure areas such as dayrooms or recreation yards as long as the group's activities do not disrupt other offenders authorized to use the same area." (Id. (IV)(E)(12)(c).) If for any number of reasons inmates do not participate in group religious activities, "they may practice their faith privately/individually through prayer, meditation, reading, reflection, etc." (Id. (IV)(A)(1)(c).)

An inmate who requests new religious activities not currently recognized by the VDOC must submit a complete and well-documented form "Request for Recognition of Religious Group" to the warden. (Id. (IV)(D)(3).) If the warden accepts the form, the warden forwards it to the VDOC Faith Review Committee with the warden's recommendation to approve or disapprove the request. (Id. (IV)(D)(4).) The Faith Review Committee reviews the materials and proposes its recommendation to the VDOC Deputy Director, who makes the final decision. (Id.) The policy

3

further provides that at least five inmates must be needed "to establish, maintain and hold group services, programs or meetings for a religious group" although a warden has the discretion to reduce that threshold. (Id. (IV)(E)(12).)

Plaintiff exhausted his administrative remedies about VDOC's recognition of the requested Holy Days through Level II review. In response to plaintiff's appeal of the Level I review, the defendant commented, "[T]here is no requirement in the Catholic doctrine which states that the Holy Days of Obligation are to be work and program proscription days." (Pl.'s Ex. C. (no. 2-3) 2.) The defendant also advised plaintiff that he could submit a request to his warden to request the VDOC to recognize his Holy Days' observances. (Id.)

Plaintiff subsequently submitted a Request for Recognition of Religious Group form to the Warden on May 13, 2010, requesting that January 1st (Mary, Mother of God), August 15th (Solemnity of Assumption), November 1st (All Saints), December 8th (Immaculate Conception), and December 25th (Nativity of our Lord Jesus Christ) become VDOC-recognized Holy Days. Plaintiff included with his request a web-page printout from About.com that listed the dates of the requested Holy Days. (Warden Aff. ¶ 6.) The Warden received the request on May 24, 2010, and responded by asking plaintiff to provide more information about the requested holidays because plaintiff's form only listed the specific dates without an explanation about their significance. The Warden avers that plaintiff never submitted the requested information and he told plaintiff that he was free to observe the requested Holy Days in his housing unit if their observance does not disrupt the DCC's normal operation and security. (Id. ¶¶ 6, 8.) However, plaintiff avers that he sent the requested information to the Warden, who then subsequently spoke with plaintiff about the request for approximately twenty minutes. (Pl.'s Aff. in Resp. ¶ 1.)

Plaintiff argues that the defendant's actions have violated his free exercise of religion rights

4

via the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., because the VDOC accepts federal funds. Plaintiff also argues that the defendant's grievance response about plaintiff's perceived need to refrain from working constitutes an unconstitutional entanglement of state government in religious practice. (Compl. ¶ 17.) Plaintiff further argues that the VDOC's failure to acknowledge a distinction between Catholicism and other Christian denominations and its acknowledgment of non-Catholic religions' Holy Days while denying plaintiff's requested Holy Days violates the Fourteenth Amendment's equal protection clause.

Plaintiff requests as relief a declaration that the defendant violated his religious rights and a permanent injunction to recognize his requested Catholic holy days and to allow excused absences from any work and programming assignments on those days. Plaintiff also requests costs, $2,100 punitive damages, and any additional appropriate relief. The defendant in response requests immunity and argues that he did not violate plaintiff's constitutional and statutory rights or unduly entangle state government with religion.

II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3] Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving

---

[3] The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a timely Roseboro notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

5

party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to

defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

A.  Qualified Immunity

The defendant argues that he is entitled to qualified immunity in his individual capacity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (modified by Pearson v. Callahan, 129 S. Ct. 808 (Jan. 21, 2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)). Qualified immunity may be invoked by a government official sued in his personal capacity but is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent. Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006).

Qualified immunity is an immunity from suit rather than a mere defense to liability. A plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993). However, a defendant must demonstrate that the right was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by

7

qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent."). Thus, I will first review the relevant legal standards to determine whether plaintiff shows that the defendant violated his rights.

1. Standards

   a. First Amendment Standards for the Free Exercise and Establishment Clauses

      i. Free Exercise Clause

The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 523 (1993). Its protections, including its directive that no law shall prohibit the free exercise of religion, extends to the prison environment. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). However, when a prison regulation impinges on inmates' constitutional rights, the regulation may still be valid if it is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). This standard accords "deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006). To evaluate a claim by this standard, I must inquire:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

Id. at 200 (citing Turner, 482 U.S. at 89-92).

ii. Establishment Clause

The Establishment Cause of the First Amendment states that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. This Clause prohibits state action with a sectarian legislative purpose or with the primary effect of advancing religion, including fostering an "excessive government entanglement" with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). See Agostini v. Felton, 521 U.S. 203, 232 (1997) (stating that "excessive entanglement" has sometimes been considered independently, and sometimes as part of the "effects" analysis). The test for determining whether a governmental act withstands an Establishment Clause challenge is whether (1) the act has a secular purpose; (2) its principal or primary effect be neither to advance nor to inhibit religion; and (3) it not foster excessive government entanglement with religion. See Lemon, 403 U.S. at 612-13; Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc., 224 F.3d 283, 288 (4th Cir. 2000).

b. RLUIPA Standard

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise[3] of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that" the burden is "in furtherance of a compelling governmental interest[] and is the least restrictive means of furthering that ... interest." 42 U.S.C. § 2000cc-1(a). A substantial burden on religious exercise occurs when a government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace, at 187 (quoting Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981)). Once a plaintiff produces prima facie evidence to

---

[3] RLUIPA broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). See Adkins v. Kaspar, 393 F. 3d 559, 567-68 (5th Cir. 2004) (holding that Sabbath and holy day activities "easily qualify as 'religious exercise' under ... RLUIPA's

9

support the claim that the challenged practice or law substantially burdens the plaintiff's exercise of religion, the government bears the burden of persuasion on whether the practice or law is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-2(b). RLUIPA does not authorize an award of damages against state officials sued in their individual capacities, Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009), and the Eleventh Amendment bars a recovery of damages under RLUIPA against state officials sued in their official capacities, Madison v. Virginia, 474 F.3d 118, 133 (4th Cir. 2006).

    c.    Fourteenth Amendment's Equal Protection Clause Standard

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985) (holding that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"). To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. City of Cleburne, 473 U.S. at 439-40. Once this showing is made, a court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. Id. at 440.

    2.    The Defendant is Entitled to Qualified Immunity in his Individual Capacity.

After reviewing these standards, I find that the defendant is entitled to qualified immunity because plaintiff fails to show that the defendant's conduct violated plaintiff's right and the unlawfulness of defendant's response to plaintiff's grievance is not apparent when viewed from a perspective of an objectively reasonable official. It is undisputed that the defendant did not either

---

generous definition").

approve or disapprove a request from plaintiff to have the VDOC provide space and excused absences for the Holy Days. Plaintiff submitted his request to the DCC Warden, who did not pass the request on to the Faith Review Committee, which would have then forwarded the request to the defendant.[4]

The only other involvement between the defendant and plaintiff's claims are that the defendant approved DOP 841.3 and that he replied to plaintiff's Level II grievance complaining that the Holy Days do not receive the same level of recognition as other faiths' religious holidays. The policy's unlawfulness is not apparent under the Free Exercise Clause or RLUIPA because it provides a procedure to petition for the recognition of religious holidays, does not discriminate on the basis of religion, does not promote any particular religion, recognizes the frequently celebrated religious holidays of inmates' various religions, allows inmates to celebrate these holidays, and permits offenders to gather informally in leisure areas as long as the activities do not disrupt other offenders, which would implicate security concerns.

In his Level II response, the defendant advised plaintiff that DOP 841.3 prohibits the VDOC from preferring any religion over another and its limited resources prevent the VDOC from automatically funding all the religious activities of all VDOC inmates' religions. The defendant further advised plaintiff that, although the VDOC cannot automatically make that recognition, inmates may request the VDOC to acknowledge and authorize the activities by submitting a request to the Warden, who would forward it to the Faith Committee and ultimately to the defendant. Defendant further advised plaintiff that he may still honor the Holy Days by his own preferences within the allowances of DOP 841.3. Thus, plaintiff fails to establish that the defendant's acts were

---

[4]The Warden avers he returned the request form to the plaintiff because he needed more information about the Holy Days' relevance. Plaintiff avers that he had replied with all the requested information describing the Holy Days' importance. However, this contradiction is not material because it is not disputed that the defendant did not receive plaintiff's request for the Holy Days' observance recognition, pursuant to DOP 841.3(IV)(D).

11

not rationally related to controlling costs and maintaining security; endorsed one religion over another by advising plaintiff of the DOP's procedures to seek the Holy Days' recognition; or substantially burdened his religious exercise under RLUIPA.

Defendant is also entitled to qualified immunity on the Establishment Clause claim because plaintiff fails to show that defendant's Level II response violated the Clause. Defendant's dictum, "[T]here is no requirement in the Catholic doctrine which states that the Holy Days of Obligation are to be work and program proscription days[,]" was neither determinative of the Level II review nor advanced or inhibited religion. Furthermore, the Level II response is purely secular in its purpose and fostered no entanglement with religion whatsoever.[5]

Defendant is also entitled to qualified immunity on the equal protection claim because plaintiff fails to establish that he was treated differently from other similarly situated inmates or that the alleged unequal treatment was the result of intentional or purposeful discrimination. Plaintiff cannot succeed on an allegation of unequal treatment by the defendant because his application for the Holy Days' observances was never reviewed by the defendant; without the defendant's decision on an application, no unequal treatment by the defendant about the Holy Days could have occurred. Furthermore, the DOP already provides for the similar recognition of Jewish, Muslim, and Catholic holidays. Plaintiff also fails to forecast evidence on which he could prove that the defendant's Level II response or the policy was the result of purposeful discrimination based on his religion, especially since the policy provides for separate Catholic observances when a facility's resources permit them. Plaintiff does not offer evidence that the policy and the Level II response, which referenced the policy's provisions, were based solely on the fact that Catholicism is treated differently in the VDOC. See Chapman v. Reynolds, 378 F. Supp. 1137, 1140 (W.D. Va. 1974)

---

[5] Plaintiff's Establishment Clause claim against defendant in his official capacity fails for the same reason.

(finding conclusory accusations that different treatment may have been motivated by race to be insufficient to state § 1983 discrimination claim).

B. Plaintiff's action against the Defendant in his Official Capacity may not proceed because Virginia is immune from damages and equitable relief is moot.

The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." Edelman v. Jordan, 415 U.S. 651, 663 (1974). This immunity extends to "arms of the State," Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977), including state agencies and state officers acting in their official capacity. Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Virginia has not waived its sovereign immunity to § 1983 and RLUIPA damages actions. Thus, plaintiff may not recover damages against the defendant in his official capacity because the Eleventh Amendment bars claims for money damages against an Virginia official who is sued in his official capacity. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

"[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'" Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (quoting North Carolina v. Rice, 404 U.S. 244, 246 (1971)). "Moot questions require no answer," Mo., Kan. & Tex. Ry. v. Ferris, 179 U.S. 602, 606 (1900), and, thus, federal courts "[are] not empowered to decide moot questions or abstract propositions," California v. San Pablo & Tulare R.R., 149 U.S. 308, 314 (1893).

Plaintiff's release from the VDOC facility moots his request for injunctive relief. See, e.g., Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007) (stating a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (transfer rendered moot a prisoner's claims for injunctive and declaratory relief, but not claims for damages); Taylor v.

13

Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (same). The possibility plaintiff may re-enter the VDOC system is too speculative to find a justiciable claim for injunctive relief. See L.A. v. Lyons, 461 U.S. 95, 105-08 (1983) (holding that Lyons did not have standing to seek an injunction prohibiting the Los Angeles Police Department from employing chokeholds because he could not establish that he would be subjected to a chokehold in the future); O'Shea v. Littleton, 414 U.S. 488, 497 (1974) (holding that no case or controversy existed to issue injunction about the enforcement of criminal laws because it was to be assumed that "[plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners"). Regardless of the impact the requested injunction might have for other inmates, there is only one plaintiff, and an injunction would have no effect on him because he is no longer within a VDOC facility. Therefore, injunctive relief is no longer appropriate, and plaintiff's action against the defendant in his official capacity is moot.

III.

For the foregoing reasons, defendant is entitled to qualified immunity for all individual capacity claims, and I am unable to award plaintiff damages or an injunction for his official-capacity claims. In light of this disposition, I decline to issue a declaration that the defendant violated plaintiff's RLUIPA or the First Amendment rights. See Wilton v. Seven Falls Co., 515 U.S. 277, 288 (1995) (explaining that "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration"). Accordingly, I grant plaintiff leave to proceed in forma pauperis, grant the defendant's motion for summary judgment, and deny as moot plaintiff's motion for a hearing.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to the plaintiff and counsel for the defendant.

**ENTER**: This 18th day of March, 2011.

/s/ Jackson L. Kiser
Senior United States District Judge